Filed 10/27/25  Schali v. Beougher CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FRITZ SCHALI, et al.,<br><br>　　Plaintiffs and Respondents,<br><br>　　v.<br><br>DENNIS BEOUGHER,<br><br>　　Defendant and Appellant. | F087386<br><br>(Super. Ct. No. CV-23-003795)<br><br><br>**OPINION** |

　　　　APPEAL from an order of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

　　　　Burke, Williams & Sorensen, Kevin D. Siegel and Mark J. Austin, for Defendant and Appellant.

　　　　Berliner Cohen, Michael B. Ijams and Robert Aversa-Goodman, for Plaintiffs and Respondents.

　　　　　　　　　　　　　　　—ooOoo—

　　　　This is an appeal from the denial of an anti-SLAPP motion filed in a malicious prosecution action pending in the Stanislaus County Superior Court.  We reverse the trial court's order denying the anti-SLAPP motion.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      Sale of Patsy Maisetti's Farmland to Fritz and Donna Schali in 2020, With Maisetti Reserving a Life Estate Interest in an *Unspecified* 10,000 Square Foot Area (Including Her Existing Mobile-Home Residence) of the Property**

This matter arises from a real estate transaction between Patsy Maisetti on one hand and Fritz and Donna Schali (collectively, the Schalis) on the other hand.  In October 2020, Maisetti sold her 19-acre farm property (including a mobile home), located on Almond Avenue in Patterson (the property or Almond Avenue property), to the Schalis.  The transaction was memorialized in a standard California Association of Realtors form agreement (purchase agreement or purchase and sale agreement).  The purchase agreement reflected that on October 27, 2020, Maisetti accepted the Schalis' offer to buy the property.

Attached to the purchase agreement was an addendum that was signed by the parties on October 27, 2020.  The addendum referred to the Schalis as "Buyer/Tenant" and to Maisetti as "Seller/Landlord."  The addendum contained the following terms in part (without any additional contextual information or explanation):

> "1) Mrs. Maisetti alone will Rent/occupy the mobile home at [the Almond Avenue property].

> "2) If Ms. Maisetti is unable/unwilling to remain in the mobile home at [the Almond Avenue property], her personal items will be removed per family agreement [w]ithin 90 days of such notice of being unwilling/unable.

> "3) Mr. Schali to replace the roof on the mobile home at [the Almond Avenue property].  As Soon As Possible.

> [¶] … [¶]

> "8) Mrs. Maisetti has full rights and privacy as a tenant to hold and enjoy the specific location on which the mobile home is located and access to and from (100 ft x 100 ft. except barn)."

The purchase agreement indicated that Maisetti was not represented by a real estate brokerage firm; rather, it was an "FSBO" or for-sale-by-owner transaction.  As for

2.

the buyers (the Schalis), they were represented by PMZ Real Estate and real estate agent Lennox Harris of PMZ Real Estate. Both parties to the transaction were represented by attorneys: Maisetti was represented by attorney Dennis Beougher and the Schalis were represented by attorney Leslie McHugh.

A few weeks after the purchase agreement was finalized, Maisetti and the Schalis signed a separate "Agreement with Regard to Life Estate Provisions" or life estate agreement. Maisetti signed the life estate agreement on November 16, 2020 and the Schalis signed it on November 17, 2020. The life estate agreement referred to the Schalis as "Owner" and to Maisetti as "Life Tenant." The life estate agreement specified: "*Owner has purchased the Property, subject to a life estate in Grantor, PAT D. MAISETTI.*" (Italics added.) The agreement further noted: "THIS AGREEMENT WITH REGARD TO LIFE ESTATE PROVISIONS ('Agreement') is made this 16th day of November 2020, with regard to that certain Grant Deed with reservation of Life Estate Interest in Grantor, PAT D. MAISETTI ('Grant Deed'), by and between, FRITZ SCHALI and DONNA SCHALI … and PAT D. MAISETTI[.]"

The life estate agreement stated: "The term [of the life estate] begins on the date of recordation of the Grant Deed and shall terminate on the date of Life Tenant's death[.]" Among other provisions, the life estate agreement specified that Maisetti "shall occupy the residence situated on the Property (the 'Residence') free of rent" and "no other tenant(s) shall reside at the Residence." The life estate agreement added: "While Life Tenant occupies the Residence, Life Tenant shall be responsible for maintaining the Residence such that the Residence does not fall into disrepair. In addition, Life Tenant shall be responsible for all expenses of the Residence and shall pay: all insurance, utilities, and maintenance costs associated with the residence and its surrounding yard." The life estate agreement further provided: "Notwithstanding Life Tenant[']s duties to maintain the Residence, Owner agrees to replace the roof of the residence as soon as possible."

3.

In addition, the life estate agreement provided: "In the event of the bringing of any action by either party thereto against the other hereon or hereunder, or by any reason of the breach of any term, covenant or condition on the part of the other party, or arising out of this Agreement, the party in whose favor final judgment shall be entered shall be entitled to have and recover from the other party, reasonable attorneys' fees to be fixed by the court, which shall have rendered such judgment."

The grant deed underlying the life estate agreement was signed by Maisetti on November 16, 2020 and recorded on November 18, 2020 at the Stanislaus County Recorder's Office. The grant deed stated: "For valuable consideration, receipt of which is hereby acknowledged, Grantor(s) Pat D. Maisetti … hereby grant(s) to Fritz Schali and Donna Schali … any and all interest in and to that certain real property in the City of Patterson, County of Stanislaus, State of California … Commonly known as [XX] Almond Avenue, Patterson, California[,] *reserving therefrom and subject to a Life Estate in Grantor, Pat D. Maisetti*." (Some capitalization omitted, italics added.) The grant deed and contemporaneous life estate agreement were drafted by Leslie McHugh, attorney for the Schalis, with some input from Dennis Beougher (the extent of the input is unclear).

**B.**     **Discrepancy Between the Grant Deed and the Purchase Agreement, with Resulting Property Tax and Insurance Problems for Maisetti**

The record indicates that, after the property transaction was completed, Maisetti—who remained living in the mobile home on the property under the life estate agreement—continued to receive property tax bills for the entire Almond Avenue property. The record further indicates that upon receipt of the bills, Maisetti paid, or was concerned she was obligated to pay, the property taxes for the entire property. Eventually, in June 2022, Maisetti and Beougher went to the Stanislaus County Assessor's Office to investigate the issue. They were told Maisetti was responsible for the property taxes on the property as a whole because, under the grant deed filed with the

4.

Recorder's Office, *she held a life estate to the entire 19-acre property.*  The record indicates that, in light of her potential liability exposure under the grant deed, Maisetti obtained, or was concerned she needed to obtain, insurance for the entire property, as a protective measure.  She also retained Beougher to assist with the deed/tax/insurance issue and with resolving other issues that had arisen in connection with her living situation at the Almond Avenue property (as noted, Maisetti had continued to live in the mobile home on the property).

**C.      Negotiations Between Dennis Beougher and Leslie McHugh to Address Issues**

On June 20, 2022, Beougher sent a letter to Leslie McHugh, attorney for the Schalis, alerting her that a revised life estate agreement and new grant deed were needed as to the Almond Avenue property transaction.  Beougher indicated the original, recorded grant deed was defective, in that it incorrectly indicated that Maisetti retained a life estate in the entire 19-acre property, rather than merely in the on-site mobile home and its curtilage (a total land area of 10,000 square feet).  More specifically, Beougher's letter stated, among other things:  "An employee of the Stanislaus County Assessor's Office informed us that my client retains a life estate for property commonly known as [XX] Almond Avenue, Patterson, California, as a result of the Grant Deed executed on or about November 16, 2020."  The letter added:  "Before my client executes a *new* Grant Deed that reserves a life estate for her 10,000 square foot Residence and associated grounds and its related driveway to Almond Avenue, she has asked me to draft the attached Agreement with Regard to Life Estate Provisions [proposed, revised life estate agreement]."  (Italics added.)

The proposed, revised life estate agreement sent by Beougher to McHugh added some new provisions to the original life estate agreement.  For example, the proposed, revised life estate agreement clarified that the Schalis purchased the Almond Avenue property "*subject to a life estate in grantor, PAT D. MAISETTI to an area of approximately 10,000 square feet* that Life Tenant resides now and for the remainder of

5.

her life … as per Exhibit A, attached hereto and incorporated herein by this reference."[1] (Italics added.) The proposed, revised life estate agreement added: "Owner shall pay all Stanislaus County property taxes paid by Life Tenant since November 16, 2020 prior to Life Tenant executing a *new* Grant Deed. Owner shall also pay Life Tenant $2,500 for time and expenses related to activities since November 17, 2020 and attorney fees that she has incurred in an amount not to exceed $1,500 prior to executing a *new* Grant Deed." (Italics added.)

The proposed, revised life estate agreement also included other new provisions, such as, that the Schalis would maintain the area around the life tenancy "in a weed free manner" and not store farm equipment in front of Maisetti's residence; that the Schalis, in addition to completing the needed roof repair, would build a ramp to the residence; that the Schalis would repair all potholes in the driveway leading to the residence; and finally that Maisetti could have a caretaker live with her in the residence.

On August 3, 2022, Beougher sent a follow-up email to McHugh: "As your client has failed to respond to my client's concerns about her ownership of [XX] Almond, Patterson, CA, she now intends to start exercising her property rights which includes requiring prior permission and submittal of proof of insurance to be provided to me before anyone comes onto her property."

On August 5, 2022, McHugh sent two emails to Beougher. In the first email, she wrote: "As I indicated to you earlier, the proposed changes to the Agreement with Regard to Life Estate Provisions that you sent are not acceptable to our clients." She added: "The property at [XX] Almond Avenue was sold by your client to ours in November 2020. The property no longer belongs to Mrs. Maisetti. She executed a Grant Deed to Fritz and Donna Schali on 11/16/2020, which was recorded on November 18,

---

[1] Exhibit A to the proposed revised life estate agreement does not appear in the record; Beougher appears to have referenced it as a placeholder.

2020. In that Grant Deed, she reserved a life estate and pursuant to that reservation, our clients and Mrs. Maisetti executed the Agreement with Regard to Life Estate Provisions. [¶] Mr. and Mrs. Schali do not wish to change the terms of the agreement." McHugh continued: "We do not know what [Maisetti] is insuring on the property—if it is a policy on the mobile home contents, then I suppose that is fine."

The second email McHugh sent to Beougher on August 5, 2022, contained one line: "Has someone asked your client to execute a new grant deed?"

On August 10, 2022, McHugh sent another email to Beougher. The email stated in part: "It is still unclear to me what you are trying to accomplish. *The Grant Deed that was prepared did not depict the 10,000 foot area because there is no separate legal parcel to describe.* The Grant Deed was prepared pursuant to the Purchase and Sale Agreement and Addendum No. 1 to the Purchase and Sale Agreement dated April 16, 2020, and signed by your client on October 27, 2020 together with the Agreement With Regard to Life Estate Provisions dated November 16, 2020 and signed by your client on November 16, 2020. Escrow closed thereafter on November 17, 2020." (Italics added.)

After asserting in her August 10, 2022, email that the existing grant deed necessarily had to describe Maisetti's life estate interest as coinciding with the *entire 19-acre parcel*, McHugh nonetheless added therein: "In an attempt to resolve issues, I have prepare[d] a 'Corrective Grant Deed' to add a drawing to clarify the *location* of the 100 ft. by 100 ft. area, *excepting the barn* as noted in the Purchase and Sale Agreement, Addendum No. 1.[2] If you can provide me with a drawing to attach as Exhibit B, I will

---

[2] McHugh attached a draft of the "corrective" grant deed she was proposing. The proposed, corrective grant deed provided: "This deed is for the purpose of clarifying the location of the life estate interest retained by Pat D. Maisetti, described in that certain grand deed dated November 16, 2020 and recorded on November 18, 2020 … in the official records of Stanislaus County." (Some capitalization omitted.) The proposed, corrective grant deed further provided that Pat Maisetti hereby grants to Fritz Schali and Donna Schali the property commonly known as [XX] Almond Avenue, "reserving therefrom and subject to a life estate in Grantor Pat D. Maisetti, for the mobile home

attach it to the Corrective Grant Deed and forward a finalized Corrective Grant Deed to you for your client's signature. I believe that our clients' real estate broker has a copy of the drawing and if this is something you wish to pursue and you don't have a copy of the drawing, I will contact him." (First italics added.)

McHugh continued in her August 10, 2022, email: "Again , it is still not clear what you are trying to accomplish here. If your client is receiving tax bills for the property and they are not for the mobile home she lives in, she should forward them to me and/or Mr. and Mrs. Schali. Unfortunately, as noted, there is no separate parcel for your client's Life estate, so I do not know if that will stop tax bills or notices from the County from being misdirected." McHugh further stated: "But if this is the issue you are concerned with, again simply advise your client to forward these types of notices to me and/or Mr. and Mrs. Schali." McHugh also noted: "As you know, our clients have no desire to amend the Agreement With Regard to Life Estate Provisions."

On August 11, 2022, McHugh emailed Beougher a drawing and photograph of the life estate area from the Schalis' real estate agent, offering to attach them to the corrective deed she had previously proposed. On August 12, 2022, McHugh emailed Beougher with a clarification to her prior assertion that the original "Grant Deed that was prepared did not depict the 10,000 foot area because there is no separate legal parcel to describe." McHugh explained: "I never claimed that there would be an illegal parcel created or intended, we just don't have a legal description for the retained life estate area." McHugh wrote: "Both the Agreement with Regard to Life Estate Provisions and the Purchase and Sale Agreement executed by your client should give you a clear idea of the intent of the parties related to the life tenancy." (Italics removed.) She continued: "I

located on the property and access to and from the mobile home containing approximately 100 ft. x 100 ft., excepting the barn area, generally depicted on Exhibit 'B' attached hereto and incorporated herein by this reference and is subject to that certain Agreement With Regard to Life Estate Provisions, dated November 16, 2022, by and between Grantor and Grantee." (Some capitalization omitted.)

offered to clarify the life estate usage area by means of a Corrective Grant Deed with the map and drawing(s) to be attached to specify the location, that was included with my letter of August 10th." (Italics removed.) She added: "My clients do not want, nor do they expect, your client to pay their taxes or maintain their insurance for the property." (Emphases removed.)

On August 16, 2022, Beougher sent a letter, via email, to McHugh, stating: "Over six weeks ago, my client discovered that you had negligently prepared/reviewed a grant deed for the sale of her property at [XX] Almond Avenue. Once my client discovered the negligently prepared grant deed that did not comply with the sales agreement, she immediately attempted in good faith to prepare a document that would allow her to execute a revised grant deed that would also comply with the sales agreement terms. In the six weeks since the good faith effort to resolve the negligently prepared deed, you have responded by questioning my client's motive by asking repeatedly the question 'what was she trying to accomplish.' Rather than admit to your negligence due to your failure to prepare a description of the life estate lot acceptable to the Stanislaus County Assessor's Office (a [metes] and bounds description), you attempted to correct your negligence without addressing any of my client's concerns."

Beougher added in the August 16, 2022, emailed letter to McHugh: "As a proximate cause of your negligence, my client has incurred $3,500 in attorney fees[.] She also incurred $2500 in damages plus out of pocket expenses for property taxes and insurance due to your negligence that has not been acknowledged." Beougher continued: "You have made it abundantly clear that your clients and you have no desire to address my client's concerns about weeds, out of pocket expenses, farm machinery junkyard in her front yard viewing area, or trespass issues." Beougher further stated: "Additionally, my client has no incentive to pay the Stanislaus County property taxes for property that she is not responsible for per the sales agreement." Beougher concluded: "[T]here is no

need to meet or record a new deed as she has accepted that your clients have no interest in address[ing] her concerns or pay[ing] for her expenses."

McHugh responded by email on August 16, 2022, to Beougher's email from earlier the same day. In her August 16, 2022 email, McHugh stated: "I truly think that I do not have all the information and need to talk this through with you. I do not know why your client is paying the property taxes for the property. I was not aware of this. I think there is information that you and your client may have, but that my client does not or that my client has not shared with me." McHugh added: "I am attempting to remedy the issue of the life estate interest in the property by the Corrective Grant Deed I forwarded to you, which clarifies the description on the grant deed, and have obtained drawings and a map to facilitate that correction." McHugh continued: "What I did not know (which sheds some light on you and your client's anger), is that she has paid the property taxes on the property or that she believes she has to do so." McHugh further stated: "As you noted, my clients are not willing to change the terms of the Agreement that is already in place. But, if I could understand some of these issues (taxes, insurance), that I did not know were happening, maybe we could come to some sort of compromise."

Beougher sent McHugh an email response the next day, August 17, 2022, as follows: "My client instructed me not to spend any money on the sale of [XX] Almond Avenue. So I must comply with her direction … My client has already been charged over $3,500 in attorney fees as a result of her attempt in good faith to correct your negligence. She is okay with the current situation given your responses to my emails/letters … As she stated – 'No good deed goes unpunished.' "

The correspondence between Beougher and McHugh indicated that the parties viewed the issues presented by the erroneous grant deed through different lenses. Beougher was concerned the erroneous grant deed had led the Stanislaus County Assessor's Office to take the position that Maisetti was *legally responsible* for making property tax payments for the entire property. Beougher's letter also reflected a concern

about expenses incurred by Maisetti in connection with the erroneous grant deed, including attorney fees and actual or potential tax and insurance payments. Finally, Beougher seemed to want an acknowledgment from McHugh that a drafting error on her part had resulted in a grant deed that did not reflect the parties' agreement.

As for McHugh, on the one hand she insisted the parties' agreement was not fully reflected in the recorded grant deed because Maisetti's life estate area did not coincide with a separate, property parcel. On the other hand, she proposed a "corrective" grant deed to rectify the admitted deficiencies in the recorded grant deed. At the same time, McHugh brushed off Beougher's concerns about the legal implications of the recorded grant deed for Maisetti in terms of property tax and other liabilities. McHugh proposed Maisetti could simply forward property tax bills in her name to the Schalis for payment and dismissed the issue of other potential liabilities. In addition, McHugh appeared largely unwilling to discuss the issue of Maisetti's out-of-pocket expenses, although her tone on this issue softened somewhat as discussions progressed.

The lack of trust between the two sides deepened over time. The record indicates Maisetti and Beougher suspected, for a time, that the Schalis and McHugh had ulterior motives in questioning Maisetti's request for a revised grant deed and life estate agreement. On October 31, 2022, Beougher sent an email to McHugh as follows: "My client called me today about your clients' unauthorized activities on HER property. My client has a life estate over the entire 19 acres *as your clients and you intended*." (Italics added.)

In December 2022, Maisetti contracted Covid-19. On December 28, 2022, McHugh informed Beougher, via email: "Mr. and Mrs. Schali have had GDR Engineering survey the 100 x 100 life estate interest and I have recently received that information from GDR Engineering. I am also attaching a copy of that 'Life Estate Exhibit' from GDR Engineering for your Information." A diagram and a photograph of the life estate area prepared by GDR Engineering were attached to the email. Among

11.

other things, the photograph depicts a large amount of farm machinery in front of Maisetti's residence.

## D. Maisetti Files a Lawsuit

On December 30, 2022, Beougher filed a two-claim complaint initiating a civil action against the Schalis. The complaint's first cause of action was styled "breach of contract," but was in effect a "reformation" claim, as specifically clarified in the complaint. (Capitalization omitted.)

The complaint's factual allegations as to the reformation cause of action state:

"[1] On or about November 16, 2020 in Modesto … plaintiff, Patsy Maisetti, and defendants, Fritz Sc[h]ali and Donna Sc[h]ali negotiated for and mutually agreed to [a transaction regarding] a parcel of land located at [XX] Almond Avenue, Patterson, California, 95363. The purpose of this agreement was to transfer to Defendants the approximately 19 acre parcel and [reserve] a life estate to plaintiff of an area approximately 100 feet by 100 feet with access to Almond Avenue.

"[2] On or about November 18, 2020, the plaintiff and defendants in Modesto … executed a purchase agreement and associated Grant Deed prepared by defendants' agents[.]

"[3] [The agreement and Grant Deed do not] specify the exact area to be reserved as a life estate by plaintiff[.] [Instead,] the Grant Deed [as] prepared by defendants' agents grants [plaintiff] a life estate over the entire parcel rather than the approximately 100 foot x 100 foot area that was and currently is her residence and the related area adjacent to plaintiff's residence plus an access easement to Almond Avenue.

"[4] *To reflect the true intent of the parties[,] the specific 100 foot by 100 foot area plus access to Almond Avenue [should be] legally describe[d] b[y] reserving a life estate to the plaintiff in this area[,] in the grant deed[,] and also the grant deed should grant the defendants the remaining area of the parcel, approximately 19 acres.*

"[5] The above-described failure of the grant deed does not reflect the intent of the parties *[and results] from the … unilateral mistake by the Defendants and their agents[,]* in that the grant deed recorded fails to state a legal description of the area to be reserved as a life estate for plaintiff as well as [grants] the plaintiff [control] over the entire 19 acre parcel.

12.

"[6] Defendants knew of or should have suspected the above-described mistake prior to the recording of the Grant Deed[.]

"[7] On or about June 14, 2020, plaintiff discovered the error in the grant deed when she went to Stanislaus County Assessor's [O]ffice to determine why she was still receiving the property tax bill for the subject parcel after its sale to the Defendants.

"[8] After numerous attempts including a letter to Defendants and their attorney dated June 20, 2022, to inform Defendants the grant deed was incorrectly prepared by Defendants or their agents, *plaintiff has been forced to file this reformation action to correct the erroneous recorded grant deed*[.]" (Italics added.)

As for the relief sought in the complaint with respect to the first cause of action, it included reformation of the grant deed. Specifically, the complaint sought: "[R]eformation of the grant deed *to specify a legal description of the life estate* to an area of approximately 100 feet by 100 feet plus access to Almond Avenue where [Maisetti's] residence is currently located … and the transfer to the Defendants of the remaining area in fee simple." (Italics added.) In addition, as to first cause of action, the complaint sought "[a]ttorney fees as stated in the purchase agreement in Paragraph 25," "costs of suit," and "[s]uch other and further relief as the Court may deem proper."

The complaint's second cause of action was styled 'failure to pay rent' and was *framed in the conditional*. More specifically, the second cause of action stated: "*If it was the intent* of the Defendants to grant the plaintiff a life estate [as reflected in the grant deed] and restated in [Beougher's June 20, 2022 notification of same to McHugh], then plaintiff demands herein fair market value for the rent of the 19 acres since November 18, 2020[,] as the owner of the life estate granted by Defendants and restated by their attorney[.]" (Italics added.)

The correspondence referred to in the second cause of action were McHugh's August 5, 2022 and August 10, 2022, emails to Beougher (attached as Exhibit C to the complaint). McHugh's August 5, 2022, email stated: "[Maisetti] executed a Grant Deed to Fritz and Donna Schali on 11/16/2020, which was recorded on November 18, 2020. In

13.

that Grant Deed, she reserved a life estate and pursuant to that reservation, our clients and Mrs. Maisetti executed the Agreement with Regard to Life Estate Provisions. [¶] Mr. and Mrs. Schali do not wish to change the terms of the agreement." McHugh's August 10, 2022, email stated: "It is still unclear to me what you are trying to accomplish. The Grant Deed that was prepared did not depict the 10,000 foot area, because there is no separate legal parcel to describe."

On January 17, 2023, some two weeks after the complaint was filed, McHugh emailed Beougher. McHugh stated, among other things: "*All* of your client's alleged damages were avoidable. Your client's conduct is reprehensible. By her own conduct, she has not only concocted her own alleged damages, but has caused actual damages to Mr. and Mrs. Schali." McHugh stated it was "unconscionable" and "unethical" that Maisetti had not simply adopted the Schalis' proposals. McHugh continued: "My clients are prepared to file a cross-complaint against Mrs. Maisetti for all of their actual costs, attorneys fees, and damages incurred related to her unconscionable actions, unless the Maisetti Complaint is dismissed immediately." McHugh added: "Alternatively, your client can re-purchase the property, in exchange for reimbursement to my clients of their full purchase price, including but not limited to real estate commissions, insurance, taxes and the costs related to survey and staking and all costs of improvements to the property, including, but not limited to the repairs made to the roof of the mobile home your client occupies, installation of the irrigation system, tree purchase and planting costs and cultivation costs, and both parties can walk away." McHugh concluded: "Please advise on or before 3:00 p.m. on January 20, 2023, if the Maisetti Complaint will be dismissed, or we will proceed accordingly."

On January 30, 2023, McHugh sent a "safe harbor notice" to Beougher to the effect that should he not withdraw the complaint, McHugh would file a motion for sanctions under Code of Civil Procedure sections 128.5 and 128.7 (subsequent undesignated statutory references are to the Code of Civil Procedure). The letter stated,

14.

in part:  "I am sending this letter to notify you that if you do not withdraw the Complaint, we intend to move for sanctions against you and Ms. Maisetti.  Enclosed are Notices of Motion and Motions for sanctions under Code of Civil Procedure sections 128.5 and 128.7, supporting Memoranda of Points and Authorities, and Declarations.  If you do not withdraw your frivolous complaint within 21 days, we will file these motions with the court."  McHugh added:  "Even if you withdraw the Complaint, you will still be personally liable for the expenses the Schalis have had to incur[.]"  McHugh continued:  "The Schalis will not be removing the limitations on Ms. Maisetti's use or be expanding the life tenancy area of the Life Estate tenancy.  They do, however, remain ready, willing, and able to record a corrective Grant Deed to describe the dimensions and location of the Life Estate area more precisely."

**E.      Maisetti's First Amended Complaint, Ongoing Settlement Negotiations, and the Schalis' Newly Provided Legal Description of the Life Estate Area**

On February 1, 2023, Beougher filed a "First Amended Complaint for Reformation of Grant Deed" (FAC), which asserted only a single claim, for breach of contract, and sought reformation of the grant deed.  The sole cause of action in the FAC realleged the same factual allegations as were included in the original complaint as to the cause of action seeking reformation of the grant deed.  As for the FAC's prayer for relief, the FAC requested:  "[R]eformation of the grant deed to specify a legal description of the life estate to an area of approximately 100 feet by 100 feet plus access to Almond Avenue where [Maisetti's] residence is currently located … and the transfer to the [Schalis] of the remaining area in fee simple."  In addition, the FAC sought "[a]ttorney fees as stated in the purchase agreement in Paragraph 25," "[Maisetti's] out of pocket expenses and costs of suit herein incurred," and "[s]uch other and further relief as the Court may deem proper."

Subsequently, on February 3, 2023, McHugh and Beougher had a "conversation" in which they discussed settlement of the matter.  On February 6, 2023, Beougher sent a

15.

letter to McHugh by email and U.S. Mail.  In the letter, Beougher stated:  "My client will accept your clients' offer to settle the above-entitled litigation by payment to her for her out of pocket expenses totaling $5,055.  This amount does not include any attorney fees."  Beougher outlined next steps.  He wrote that once Maisetti received a check in the amount of $5,055 for her out of pocket costs arising from the inaccurate grant deed, she would sign the revised grant deed prepared by McHugh and the Schalis would record it.  Thereafter, Maisetti would dismiss the pending litigation with prejudice.  Beougher also clarified that "[e]ach party will assume its own responsibility for filings fees, recordation fees and attorney fees associated with the above-entitled litigation and related dispute(s)."

On February 10, 2023, in response to a query by Beougher, McHugh sent Beougher a *new*, revised grant deed with, for the first time, an *actual legal description* of the life estate area.  Exhibit B to the new, revised grant deed finally contained a *legal description* of the life estate area.  The legal description was prepared by Sean Harp, a licensed land surveyor, and was dated January 16, 2023.[3]

---

[3] The Legal Description of the life estate area contained in Exhibit B to the new, revised, grant deed provided:

"Being a portion of Lot 412 as shown on the Map of Patterson Colony Sub-Tract No. 2, filed in Volume 5 of Maps, Page 23, Stanislaus County Records, situate[d] in the City of Patterson, County of Stanislaus, State of California, more particularly described as follows:

"Commencing at the Northwesterly corner of said Lot 412, said point being on the center line of Almond Avenue (50 feet wide);

"1.     thence along the southwesterly line of said Lot 412, South 30°00'00" East, 198.00 feet;

"2.  thence along a line parallel with the northwesterly line of said Lot 412, North 60°00'00" East, 10.00 feet to the Point of Beginning;

"3.  thence continuing along said parallel line, North 60°00'00" East, 100.00 feet;

16.

Thereafter, McHugh responded to Beougher's February 6 letter in a letter dated February 13, 2023, sent via email and U.S. Mail.  McHugh stated:  "I do not recall making an offer to settle the above-entitled litigation by payment of your client's out of pocket expenses totaling $5,055.  What I do recall is that during our conversation on Friday, February 3, 2023, I reminded you that our clients had no issue in reimbursing your client for the taxes paid if she would provide us with the payment receipts and/or cancelled checks."

McHugh added:  "I note that the 2022 tax year indicates a total of $1,827.26, for the property and $116.90, for the mobile home (which is your client's responsibility [see paragraph 3 of the Agreement Regard to Life Estate Provisions dated November 16, 2020]).[4] Copies of the print-out from the Assessor's office for the Property and the mobile home are attached[.]  By my calculations, if [Maisetti] paid the tax assessment for the 2021 and 2022 tax years for the property, that would be $3,654.53 for the property

---

"4.  thence along a line parallel with said southwesterly line, South 30°00'00" East, 100.00 feet;

"5.  thence along a line parallel with said northwesterly line of Lot 412, South 60°00'00" West, 100.00 feet;

"6.  thence along a line parallel with said southwesterly line, North 30°00'00" West, 100.00 feet to the Point of Beginning;

"Containing 10,000 square feet, more or less.

"The above described property is for life estate purposes only.  This property is not a separate legal property and cannot be sold or transferred."

[4] Paragraph 3 of the life estate agreement makes no reference to property tax. Paragraph 3 of the life estate agreement provides in full:  "While Life Tenant occupies the Residence, Life Tenant shall be responsible for maintaining the Residence such that the Residence does not fall into disrepair.  In addition, Life Tenant shall be responsible for all expenses of the Residence and shall pay:  all insurance, utilities, and maintenance costs associated with the Residence and its surrounding yard."

17.

taxes.[5]  So, once again, we request that your client provide a breakdown of the taxes paid, together with receipts and/or cancelled checks to verify what tax payments were made."  McHugh continued:  "Additionally, be advised that our clients will not reimburse your client for insurance, if that is a part of the $5,055 reimbursement she is requesting.  She was advised that she did not need to insure the property on August 5, 2022, August 10, 2022, and August 12, 2022.  If she chose to maintain additional insurance on more than her residence and its contents, she did that on her own accord."

McHugh further stated:  "All that being said, in a good faith attempt to resolve this matter once and for all, the Schalis have authorized me to convey the following offer of settlement:

> "1.     Your client agrees to pay $40,000 for fees, costs and expenses incurred to date, by check payable to 'Fritz and Donna Schali['] to be received at my office no later than Friday, February 17, 2023;

> "2.     Your client will provide the receipts and/or cancelled checks for payment of taxes for our clients' approval to be received at my office no later than Friday, February 17, 2023;

> "3.     Your client will reimburse our client on or before February 17, 2023, for the repair of the water leak, to the mobile home property in the amount of $795.00, for which our client paid to J&S Powers Plumbing on February 6, 2023.  A copy of the J&S Powers Plumbing invoice is attached hereto.  This is for water to your client's residence and is her responsibility pursuant to paragraph 3 of the Agreement with Regard to Life Estate Provisions dated November 16, 2020.

---

[5] The documentation McHugh attached consists of two printouts.  One printout relates to [XX] Almond Avenue (i.e., the Almond Avenue property).  This printout reflects that the owner of the property is "MAISETTI PAT D LIFE ESTATE" and shows that a balance of $1,827.26 was owed for 2022 (with a final due date of April 2023).  The other printout describes the property in question as "Mobile Homes" at the Almond Avenue property; names Pat and Jerry Maisetti as the owners of the mobile homes; and reflects that $116.90 was paid in property taxes in 2022.  Neither printout contains any information for 2021.

Another document in the record indicates that the property tax levied on the Almond Avenue property was $8,062 in 2021 and $1,827 in 2022.

"4.     Within four business days of receipt of the Corrective Grant Deed attached hereto, your client will sign and return the fully executed and notarized Corrective Grant Deed[.]

"5.     Your client will file and provide [us] with a file-marked copy of a Dismissal With Prejudice of the above referenced action[.]

"6.     In exchange for the receipt of the settlement check, reimbursement for the J&S Plumbing invoice and the file-marked Dismissal with Prejudice and execution of a Settlement Agreement, [we] will record the Corrective Grant Deed and provide a recorded copy of the Corrective Grant Deed to your client.

"Upon approval of the settlement terms, I will forward a Settlement Agreement to you for review and execution."

"*Now that we have a complete legal description* for the life estate area,[6] your client is hereby advised to keep all of her personal belongings, including but not limited to her car and farm animals within the (100 x 100 foot) life estate area.  Additionally, as a reminder to your client, upon breach of the Agreement with Regard to Life Estate Provisions dated November 16, 2020 and a subsequent termination of the Life Estate, her personal belongings are to be removed within ninety (90) days.

"If we do not hear from you on or before the close of business on Friday, February 17, 2023, we will proceed with [a] demurrer, Motions for Sanctions and possible malicious prosecution" action(s) against you and your client."

On February 17, 2023, Attorney Lisa Battista of the Senior Law Project substituted into the lawsuit to represent Maisetti.  On February 24, 2023, Attorney Battista filed a voluntary dismissal of the action.  The Schalis never filed a pleading in the case brought by Maisetti.  Indeed, the case was filed on December 30, 2022, and dismissed by February 24, 2023, a relatively short period.

The record suggests that, as of August 2023, the erroneous recorded grant deed had not been updated or revised and Maisetti continued to have a life estate over the

---

**6** Attached to McHugh's February 13, 2023, letter was the new, draft, revised grant deed containing, in Exhibit B, the land surveyor's report of January 16, 2023, that provided a legal description of the life estate area.

19.

entire 19-acre Almond Avenue property. She also remained the responsible party for the property as reflected in county records.

## F.  The Schalis File the Instant Malicious Prosecution Lawsuit

On July 7, 2023, McHugh filed a "complaint for malicious prosecution" against Maisetti and Beougher. The malicious prosecution complaint alleged, with respect to Maisetti and Beougher's underlying complaint: "Under the first cause of action, Maisetti alleged that the Schalis breached the Sale Agreement by refusing to record a grant deed that fully reflects the parties' intent for Maisetti to retain a life estate in only a 100-foot-by-100-foot portion of the Property." The malicious prosecution complaint added: "Maisetti lacked probable cause to bring this cause of action because the Schalis had repeatedly offered to perform in precisely the manner the cause of action demanded." The malicious prosecution complaint continued: "A cause of action for breach of contract cannot be maintained against a defendant whose performance has been prevented or refused by the plaintiff." The complaint added: "Beougher knew, or should have known, that Maisetti lacked probable cause to assert the first cause of action when he drafted the Complaint because the Schalis' repeated offers to perform were communicated to him by McHugh."

The malicious prosecution complaint further asserted, with respect to Maisetti and Beougher's underlying complaint: "Under the second cause of action, Maisetti alleged that she was the true owner of the Property because the Grant Deed did not precisely describe the precise dimensions of her life estate. It further alleged that because she was the true owner of the Property, the Schalis owed her rent for their use of it." The malicious prosecution complaint stated: "Maisetti lacked probable cause to bring the second cause of action because she did not own the Property and therefore had no right to collect rent from the Schalis. When the parties executed the Grant Deed, they mutually interpreted it to only retain to Maisetti a life estate in a 100-foot-by-100-foot portion of the Property. Insofar as the Grant Deed can be interpreted to give Maisetti a life estate in

20.

the entire Property, this interpretation is a mutual mistake of law, and Maisetti may, therefore, not claim that she has a life estate in the entire property on the basis of the Grant Deed."

The malicious prosecution complaint brought by the Schalis and McHugh went on: "On January 30, 2023, the Schalis forwarded Maisetti and Beougher motions for sanctions under Code of Civil Procedure sections 128.5 and 128.7, in compliance with those sections' safe harbor procedures. The letter informed Beougher of the above-described deficiencies in the Complaint and informed him of the Schalis' intent to pursue sanctions if Maisetti did not withdraw the Complaint." The malicious prosecution complaint added: "On or around February 1, 2023, Maisetti filed a first amended complaint which only asserted the first cause of action. [¶] On February 13, 2023, McHugh sent Beougher a letter informing him that the first amended complaint did not cure the defects that made it subject to sanctions. [¶] On February 16, 2023, Beougher … was replaced by a new attorney, Lisa Battista [of the Senior Law Project]. [¶] On February 24, 2023, Maisetti voluntarily dismissed her civil action."

In addition, the malicious prosecution complaint asserted: "Maisetti acted with malice in initiating the civil action because, on information and belief, Beougher and Maisetti initiated the civil action for the purpose of pressuring the Schalis into capitulating to their demands that the Schalis alter the terms of the Life Estate Agreement, as no other purpose can be reasonably inferred from the above-described facts." The malicious prosecution complaint went on: "Furthermore, *Maisetti* acted with malice in initiating the civil action because, on information and belief, Beougher and Maisetti did not believe the causes of action brought by the Complaint to be valid at the time they filed it." (Italics added.) The complaint did not expressly allege that *Beougher* acted with malice in filing the underlying complaint.

The malicious prosecution complaint asserted: "As a proximate result of the Complaint, the Schalis have incurred $37,051.50 in attorneys' fees and costs." The

malicious prosecution complaint sought compensatory damages "not less than $37,051.50," "punitive damages," and "costs of this suit."

On August 9, 2023, Maisetti filed an answer to the Schalis' malicious prosecution complaint, including a general denial. Beougher filed an answer to the malicious complaint on November 16, 2023, including a general denial.

## G.    Beougher's Anti-SLAPP Motion

On August 8, 2023, Beougher filed a special motion to strike (anti-SLAPP motion)[7] pursuant to Code of Civil Procedure section 425.16, to strike the Schalis' malicious prosecution complaint.

Beougher's anti-SLAPP motion stated, in part:

"Plaintiffs cannot show a probability of success on their Complaint for Malicious Prosecution because they fail on each of the three required elements of a malicious prosecution action – failing to meet just one of these elements is fatal."

Beougher's motion papers further stated:

"The chronology of events set forth in the allegations of Plaintiff's Complaint omits the most salient facts of Maisetti's Underlying Action and thereby leads to a distorted view of the Underlying Action's legitimate purposes. However, the evidence and testimony presented with this present Motion demonstrate that Beougher and his former client Maisetti after months of unsuccessful negotiations to correct a recorded Grant Deed filed a lawsuit with two causes of action and subsequently a superseding first amended complaint with one cause of action that sought only the reformation of the Grant Deed, as permitted by Civil Code section 3399 and CCP section 1060. The Underlying Action was grounded in law and fact to achieve a deserving outcome for Maisetti and it was not motivated by malice. In the face of threats to create satellite litigation seeking sanctions in the form of attorney fees, and before Plaintiffs had filed any pleading, Maisetti filed a voluntary dismissal without prejudice. The gravamen of Plaintiff's Complaint is based on a false premise, namely that the Plaintiffs had already offered 'precisely' what the Underlying

_____

[7] " ' "SLAPP" is an acronym for "strategic lawsuit against public participation." ' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 785, fn. 1.)

22.

Complaint was seeking, and therefore the Underlying Complaint was malicious and frivolous. However, Plaintiffs did not meet Maisetti's reasonable requests before the Underlying Complaint was filed. [Citation.] Plaintiff[s'] Complaint is a Strategic Lawsuit Against Public Participation and seeks to punish Defendants for asserting Maisetti's rights."

Beougher submitted a declaration and multiple exhibits in support of his anti-SLAPP motion. Beougher declared that towards the end of December 2022, Maisetti was diagnosed with Covid-19 and it was important to "more quickly move the dispute to a faster comprehensive resolution" and once and for all "resolve the issues related to the faulty Grant Deed." To this end, he filed the complaint in the prior, underlying matter. Beougher declared: "By seeking reformation of the Grant Deed, the first amended complaint sought to have a ruling that would correct the Grant Deed and convey the approximately 19 acres to the Plaintiffs and have the property taxes sent to the Plaintiffs and also terminate the need for insurance risk for the same 19 acres."

In his declaration, Beougher also stated: "After the underlying lawsuit was filed on December 30, 2022, I received Plaintiff's attorney's letter, dated January 17, 2023, submitted as Exhibit 10, demanding that Ms. Maisetti execute a new Grant Deed that Plaintiffs prepared[.] On January 30, 2023, Attorney McHugh served me with a voluminous brief pursuant to Code of Civil Procedure 428/426.7 for sanctions, alleging that the lawsuit that I had filed on December 30, 2022, on behalf of my client[,] was frivolous and without merit and demanding [payment for the Schalis' expenses]."

Beougher further stated in his declaration: "On February 10, 2023, I received the email message from Attorney McHugh with a further revised corrective Grant Deed. This message is submitted as Exhibit 11. Attached to that message was a more formal surveyor's report setting out more specific boundaries to Ms. Maisetti's life estate plot. That surveyor's report was dated January 16, 2023, and is submitted as Exhibit 12. Thus, it is seen that Attorney McHugh and Plaintiffs, after the filing of the lawsuit that Plaintiffs allege was frivolous and filed with malice, acknowledged that indeed the

23.

Plaintiffs had not done everything they could have to meet Ms. Maisetti's legitimate requests for more specificity and more clarity about the terms, including the exact location of Ms. Maisetti's 10,000 square foot plot life estate."

Beougher noted in his declaration: "The First Amended Complaint that I filed states on the title page 'Reformation of Grant Deed.' Although the heading for the sole cause of action was inadvertently mistitled "Breach of Contract," the prayer and the substance of the sole cause of action do not allege a breach of contract cause of action. This is further substantiated by the fact that the prayer does not request monetary damages, but rather only requests that the court order a corrective grant deed." Beougher added: "By seeking reformation of a recorded Grant Deed, the complaint sought adjudication by the Court that would clarify and correctly memorialize the respective rights and obligations of the parties to the Property[,] as the Purchase Agreement fails to state the exact location of the life estate my client intended to retain when she sold the Property to Plaintiffs."

The Schalis filed an opposition to Beougher's special motion to strike their malicious prosecution complaint. Their opposition addressed Maisetti's prior, underlying FAC and its *sole* cause of action for breach of contract/reformation. McHugh submitted a declaration and multiple exhibits in support of her opposition to Beougher's anti-SLAPP motion. Beougher filed a reply in support of his anti-SLAPP motion, along with a supplemental declaration.

## H.    The Trial Court's Ruling on Beougher's Anti-SLAPP Motion

The trial court heard argument on Beougher's anti-SLAPP motion on October 18, 2023. The court thereafter issued its ruling in a one-paragraph-long minute order, as follows: "Defendant Dennis Beougher's Special Motion to Strike Complaint (Anti-SLAPP) – DENIED. [¶] The Court finds that the moving Defendant has met his initial burden of demonstrating that Plaintiff's Complaint against him arises out of protected activity, i.e., the filing of the referenced lawsuit on behalf of his former client,

24.

Ms. Maisetti. The burden then shifts to Plaintiffs to demonstrate the probability that they will prevail on the merits of the subject cause of action herein, i.e., malicious prosecution. Based on the evidence submitted, the Court finds that Plaintiffs have demonstrated that the malicious prosecution claim is legally sufficient and supported by a prima facie showing of facts sufficient to support a favorable judgment if their evidence is credited. (*Nevellier v. Sletten* (2002) 29 Cal.4th 82, 89.)"

Beougher appeals from the court's denial of his anti-SLAPP motion.

## DISCUSSION

### I.      The Anti-SLAPP Statute and Standard of Review

The anti-SLAPP statute, section 425.16, provides a procedure for expeditiously resolving "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.) "When served with a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16. To determine whether this motion should be granted, the trial court must engage in a two-step process." (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1543 (*Hansen*); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)

The first prong of the anti-SLAPP analysis requires the court to decide "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Equilon*, *supra*, 29 Cal.4th at p. 67; § 425.16, subd. (b)(1).) The defendant makes this showing by demonstrating the acts of which the plaintiff complains were taken "in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1); *Equilon*, at p. 67.) To ensure that participation in matters of public significance is not chilled, the anti-SLAPP statute mandates that its terms "shall be construed broadly." (§ 425.16, subd. (a); *Equilon*, at

25.

p. 60; see *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23 ["The Legislature inserted the 'broad construction' provision out of concern that judicial decisions were construing [the public participation] element of the statute too narrowly."].)

If the court determines the defendant has made the threshold showing, "it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*); § 425.16, subd. (b)(1).) To establish the requisite probability of prevailing, the plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123.) "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 (*Wilson*); *Navellier*, at pp. 88-89.)

We review both prongs of the anti-SLAPP analysis de novo. (*Hansen*, *supra*, 171 Cal.App.4th at p. 1544.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute."[8] (*Navellier*, *supra*, 29 Cal.4th at p. 89.)

As is the case with summary judgment motions, the issues in an anti-SLAPP motion are framed by the pleadings. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 655 (*Wollersheim*), disapproved on other grounds in *Equilon*, *supra*, 29 Cal.4th at p. 68, fn. 5.) Plaintiff may not rely solely on its complaint, even if verified;

---

[8] Section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

instead, its proof must be made upon competent admissible evidence. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010.) In reviewing plaintiff's evidence, the court does not weigh it; rather, it simply determines whether plaintiff has made a prima facie showing of facts necessary to establish its claim at trial. (*Ibid*.)

## II. Beougher Has Burden to Show Malicious Prosecution Cause of Action Arises from Protected Activity and is Potentially a SLAPP

Starting with the first prong of the anti-SLAPP analysis, we consider "whether the defendant has made a threshold showing that the [malicious prosecution] cause of action is one arising from protected activity," such that it is potentially a SLAPP. (*Equilon*, *supra*, 29 Cal.4th at p. 67; § 425.16, subd. (b)(1).) This in turn requires us to consider whether the Schalis' malicious prosecution complaint arose from acts taken by Maisetti and Beougher in furtherance of the "right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)

A malicious prosecution cause of action implicates the right to petition as it directly " 'arises from an underlying lawsuit, or petition to the judicial branch. By definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit.' " (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212-213, fn. omitted (*HMS Capital, Inc*.); see § 425.16, subds. (e)(1) & (e)(2).) Accordingly, Beougher has carried his burden to show, and properly established, that the Schalis' malicious prosecution complaint arises from protected activity.

Having concluded that the Schalis' malicious prosecution complaint arises from protected activity, we turn to the second prong of the anti-SLAPP analysis—whether the Schalis have established the probability of prevailing in that action.

27.

**III. The Schalis Have Burden to Show a Probability of Success on the Merits of Malicious Prosecution Claim**

To establish a reasonable probability of prevailing under the second prong of the anti-SLAPP analysis, "the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson*, *supra*, 28 Cal.4th at p. 821.) "In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Ibid.*)

Here, the trial court concluded the Schalis had shown a probability of prevailing on their malicious prosecution complaint. The court therefore denied Beougher's anti-SLAPP motion. We disagree and reverse.

**A. Elements of a Malicious Prosecution Claim**

" ' "Malicious prosecution is a disfavored action." ' (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 216 (*Daniels*).) " ' "This is due to the principles that favor open access to the courts for the redress of grievances." ' " (*Ibid*.) " ' "[T]he elements of the [malicious prosecution] tort have historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." ' " (*Ibid*.) "Three elements must be pleaded and proved to establish the tort of malicious prosecution: (1) A lawsuit was ' " 'commenced by or at the direction of the defendant [which] was pursued to a legal termination in … plaintiff's [favor]' " '; (2) the prior lawsuit ' " 'was brought without probable cause' " '; and (3) the prior lawsuit ' " 'was initiated with malice." ' " (*Ibid*.)

28.

**B.    The Schalis' Papers in the Trial Court**

The Schalis filed an opposition to Beougher's anti-SLAPP motion in the trial court.  In their opposition, the Schalis did not contest the point that Beougher had carried his burden of showing that the Schalis' malicious prosecution complaint arose from Maisetti and Beougher's protected activity (that is, filing the prior, underlying lawsuit).  The Schalis have thereby conceded the point.

Instead, the Schalis only addressed the question of the probability they would prevail in their malicious prosecution case.  In doing so, the Schalis directed their arguments *solely to the FAC* filed by Maisetti and Beougher in the prior underlying case.  *The Schalis' opposition to Beougher's anti-SLAPP motion referred to the FAC in the prior, underlying case as the "Underlying Complaint."*

The FAC contained only one cause of action, the breach of contract cause of action seeking reformation of the grant deed (reformation cause of action).  The Schalis did not address Maisetti and Beougher's initial complaint, which contained two causes of action:  the reformation cause of action and a cause of action for unpaid rent.  The "Legal Argument" section of the Schalis' opposition to Beougher's anti-SLAPP motion *makes no reference to the "unpaid rent" cause of action*.

After setting forth the applicable law as to anti-SLAPP motions and the elements of a malicious prosecution claim, the Schalis' opposition encompassed three overarching arguments under the following headings:  1) "Beougher knew Maisetti lacked probable cause to bring the Underlying Complaint because he was aware of facts that made it objectively unreasonable"; 2) "The Underlying Complaint was brought for the purpose of forcing the Schalis to capitulate to demands that were ancillary to the action and was therefore brought with malice; and 3)  "Maisetti's voluntary dismissal of the Underlying Complaint constitutes a favorable termination on the merits, and nothing Beougher has cited suggests otherwise."  Accordingly, the Schalis' opposition to Beougher's anti-

SLAPP motion is properly understood as being solely directed to the FAC (the opposition used the term, "Underlying Complaint," to refer to the FAC).

For example, the Schalis' argument, in their opposition to Beougher's anti-SLAPP motion, that Beougher knew Maisetti lacked probable cause to bring the "Underlying Complaint," went as follows: "*The Underlying Complaint [i.e., the FAC] asserted a <u>single cause of action</u> for breach of contract*. The fundamental flaw in this cause of action is that the Schalis had offered to perform in precisely the manner the Complaint requested—i.e., to reform the grant deed—and Maisetti refused to accept this performance[.]" (Italics and underline added.)

For the first time on appeal, the Schalis make arguments related to the unpaid-rent cause of action in Maisetti's original complaint. However, given the record in the trial court, Beougher argues that the Schalis have forfeited any arguments directed to the unpaid rent cause of action.

Specifically, in his briefing to this court, Beougher argues: "[On the applicable] record, allowing [the Schalis] to raise and rely upon the unpaid-rent claim now would be 'manifestly unjust' to [Beougher]. [Citations.] Among other problems, 'the failure to raise the issue in the trial court deprived [Beougher] of the opportunity to present relevant evidence that, if considered by the trial court, might have affected its ruling.' " (See *Dowling v. Farmers Insurance Exchange* (2012) 208 Cal.App.4th 685, 696 (*Dowling*) ["we will not consider a new issue where the failure to raise the issue in the trial court deprived an opposing party of the opportunity to present relevant evidence that, if considered by the trial court, might have affected its ruling"].)

Beougher further argues: "Because [the Schalis] ignored the [unpaid rent claim] issue, [Beougher] did not have a fair opportunity to [present relevant evidence in the trial court], leaving this Court without a complete evidentiary record." Beougher posits: "As such, this Court should treat [the Schalis'] new argument regarding a 'probability of prevailing' on the unpaid-rent claim as forfeited[.]"

30.

As noted, with respect to Beougher's anti-SLAPP motion, *the Schalis had the burden of showing a probability of prevailing on their malicious prosecution complaint*. Because they directed their arguments below solely to the reformation cause of action in the FAC, the Schalis have forfeited, for purposes of appeal, any arguments with respect to the "unpaid rent" cause of action in the original complaint. (See *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [" 'Failure to raise specific challenges in the trial court forfeits the claim on appeal.' "]; *Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997 [disapproving "bait and switch" tactic of raising new argument on appeal].)

Furthermore, "we are not required to consider [a] new theory [on appeal], even if it raised a pure question of law." (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767; *Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7 ["To the extent we have discretion to review the issue [that was not raised below], we decline to do so."]; accord *Dowling*, *supra*, 208 Cal.App.4th at p. 696.)

In sum, we will not address arguments presented for the first time on appeal by the Schalis with respect to the "unpaid rent" claim included in Maisetti's initial complaint.[9]

## C. The Schalis Have Not Shown a Probability of Prevailing on Their Malicious Prosecution Complaint

As noted, a malicious prosecution claim requires that the plaintiff "demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without

---

[9] We also note that, on appeal, Beougher satisfied in his opening brief his burden to show that the Schalis' malicious prosecution complaint arose from protected activity. Beougher was not required to anticipate in his opening brief the Schalis' arguments as to the second step of the anti-SLAPP analysis, at which step the Schalis bear the burden to demonstrate a probability of prevailing on their malicious prosecution complaint. Beougher could therefore properly respond to the Schalis' arguments on this issue in his reply brief.

probable cause [citations]; and (3) was initiated with malice [citations].' " (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 (*Sheldon*).) The real question presented in this case is whether the Schalis have met their burden in the second step of the anti-SLAPP inquiry, of "establish[ing] that there is a probability [they] will prevail on [their] claim." (§ 425.16, subd. (b)(1).)

We will address the Schalis' showing as to each element of their malicious prosecution claim, seriatim. In light of our conclusion above that the Schalis have forfeited any arguments related to the unpaid-rent cause of action in Maisetti's original complaint in the prior, underlying action, we address only the Schalis' arguments as to the reformation cause of action in the underlying action.

**D.     No Showing of Favorable Termination of the Prior, Underlying Proceeding**

Favorable termination of the prior proceeding is an essential element of the malicious prosecution tort. (See *Ray v. First Federal Bank* (1998) 61 Cal.App.4th 315, 318 (*Ray*).) The definition of "favorable" in this context has been the subject of many decisions over the years. The basic principle, as explained by Chief Justice Gibson in a criminal case decades ago, is as follows: "If [the termination of the underlying proceeding] is of such a nature as to indicate the innocence of the accused, it is a favorable termination sufficient to satisfy the requirement. If, however, the dismissal is on technical grounds, for procedural reasons, or for any other reason not inconsistent with his guilt, it does not constitute a favorable termination." (*Jaffe v. Stone* (1941) 18 Cal.2d 146, 150 (*Jaffe*).)

Chief Justice Gibson also explained the rationale for requiring that the prior proceeding not only be terminated but that such termination be "favorable" to the party later asserting a malicious prosecution claim. He clarified: "It is not enough … merely to show that the [prior] proceeding was dismissed. The theory underlying the requirement of favorable termination is that it tends to indicate the innocence of the accused, and coupled with the other elements of lack of probable cause and malice,

establishes the tort, that is, the malicious and unfounded charge of crime against an innocent person." (*Jaffe*, *supra*, 18 Cal.2d at p. 150.) This rationale has been reiterated on numerous occasions thereafter, by courts addressing the "favorable termination" requirement in the context of malicious prosecution based upon an underlying civil action. (See, e.g., *Casa Herrera v. Beydoun* (2004) 32 Cal.4th 336, 341 (*Casa Herrera*); *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 (*Lackner*); *Babb v. Superior Court* (1971) 3 Cal.3d 841, 846 [while *Jaffe* was a criminal case, "the gist of the statement is equally applicable to [civil] cases"].)

The prior proceeding need not have terminated as a result of a trial on the merits; "[h]owever, termination must *reflect* on the merits of the underlying action." (*Lackner*, *supra*, at p. 750; see also *Cantu v. Resolution Trust Corp*. (1992) 4 Cal.App.4th 857, 881 [for termination to be favorable, it must "reflect[] 'the opinion of someone, either the trial court or the prosecuting party, that the action lacked merit or if pursued would result in a decision in favor of the defendant' "].)

In *Casa Herrera*, *supra*, 32 Cal.4th 336, our Supreme Court noted that a favorable termination occurs, for example, where the court has terminated the prior proceeding by "(1) grant[ing] summary judgment and issu[ing] sanctions because the claim was meritless [citation]; (2) grant[ing] summary judgment because there was insufficient evidence to establish a triable issue of fact [citation]; or (3) [holding] that the defendant, as a matter of law, violated no duty to the plaintiff [citation]." (*Casa Herrera*, *supra*, at p. 342.)

On the other hand, *Casa Herrera* explained: " 'If the termination does not relate to the merits—reflecting on neither the innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it would support a subsequent action for malicious prosecution.' [Citation.] Thus, a 'technical or procedural [termination] as distinguished from a substantive termination' is not favorable for purposes of a malicious prosecution claim." (*Casa Herrera*, *supra*, 32 Cal.4th at p. 342.)

33.

Cases involving terminations not on the merits include (without limitation) the court's dismissal of the underlying suit on the basis of (1) statute of limitations (*Lackner*, *supra*, 25 Cal.3d at pp. 751-752); (2) laches (*Asia Investment Co. v. Borowski* (1982) 133 Cal.App.3d 832, 838-839); (3) plaintiffs' lack of standing (*Hudis v. Crawford* (2005) 125 Cal.App.4th 1586, 1592 (*Hudis*); and (4) the failure to comply with discovery orders (*Pattiz v. Minye* (1998) 61 Cal.App.4th 822, 827.)

A party's voluntary dismissal of the underlying action may or may not be a favorable termination on the merits for purposes of a subsequent malicious prosecution action. For example, a voluntary dismissal for economic reasons, not related to the merits of the case, does not constitute a favorable termination. (See *Oprian v. Goldrich, Kest & Associates* (1990) 220 Cal.App.3d 337, 344-345 (*Oprian*) [voluntary dismissal to avoid further litigation expense following reversal of the underlying case on appeal is not favorable termination on the merits]; *Contemporary Services Corp. v. Staff Pro Inc*. (2007) 152 Cal.App.4th 1043, 1056-1057 [voluntary dismissal for sound financial reasons is not favorable termination on the merits].)

In this context, the *Oprian* court noted: "It would be a sad day indeed if a litigant and his or her attorney could not dismiss an action to avoid further fees and costs, simply because they were fearful such a dismissal would result in a malicious prosecution action. It is common knowledge that costs of litigation, such as attorney's fees, costs of expert witnesses, and other expenses, have become staggering. The law favors the resolution of disputes. 'This policy would be ill-served by a rule which would virtually compel the plaintiff to continue his litigation in order to place himself in the best posture for defense of a malicious prosecution action.' " (*Oprian*, *supra*, 220 Cal.App.3d at pp. 344-345.)

Similarly, a party's voluntary dismissal of the underlying action is not on the merits for purposes of a subsequent malicious prosecution action where such dismissal occurs, for example, (1) in an alter ego action that was rendered moot by the reversal of a prior judgment against the corporation (*Robbins v. Blecher* (1997) 52 Cal.App.4th 886,

34.

894); (2) where the case was brought prematurely (*Eells v. Rosenblum* (1995) 36 Cal.App.4th 1848, 1856); or (3) as a result of a settlement (*Dalany v. American Pacific Holding Corp*. (1996) 42 Cal.App.4th 822, 828-829).

In other instances, the dismissal " 'may be an implicit concession that the dismissing party cannot maintain the action and may constitute a decision on the merits.' " (*Maleti v. Wickers* (2022) 82 Cal.App.5th 181, 205 (*Maleti*); see *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400 (*Sycamore Ridge*) [because parties do not ordinarily voluntarily dismiss meritorious claims, there is a rebuttable presumption that such a dismissal is a favorable termination on the merits].)[10]  But " ' "[i]t is not enough ... merely to show that the proceeding was dismissed." [Citation.]  The reasons for the dismissal of the action must be examined to determine whether the termination reflected on the merits.' " (*Maleti*, *supra*, 82 Cal.App.5th at p. 205.)

" 'If the resolution of the underlying action "leaves some doubt as to the defendant's innocence or liability[, it] is *not* a favorable termination, and bars that party from bringing a malicious prosecution actions against the underlying plaintiff." ' " (*StaffPro, Inc. v. Elite Show Services, Inc*. (2006) 136 Cal.App.4th 1392, 1399-1400;

---

**10**  Some cases have applied such a presumption, while others have emphasized that "[t]he [voluntary] dismissal of an action does not necessarily mean that there has been a favorable termination for purposes of a malicious prosecution action." (*JSJ Limited Partnership v. Mehrban* (2012) 205 Cal.App.4th 1512, 1524.)  In any event, any presumption may be conclusively rebutted if the defendant's contrary showing defeats it as a matter of law.  (*Wilson*, *supra*, 28 Cal.4th at p. 821 [in anti-SLAPP litigation, a defendant's contrary showing may defeat a plaintiff's facially sufficient evidentiary showing as a matter of law].)  However, when conflicting evidence about the circumstances surrounding the dismissal is presented, the conflict must be resolved by the finder of fact.  (*Weaver v. Superior Court* (1979) 95 Cal.App.3d 166, 185 [" 'Should a conflict arise as to the circumstances explaining the [voluntary dismissal], the trier of fact must exercise its traditional role in deciding the conflict.' "], overruled on another ground by *Sheldon, supra,* 47 Cal.3d at p. 883, fn. 9.)

*Lackner, supra*, 25 Cal.3d 747, 751 ["If the termination does not relate to the merits—reflecting on neither innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it would support a subsequent action for malicious prosecution."].)

Here, the question is whether Maisetti's ultimate dismissal of the reformation cause of action in the FAC constituted a termination on the merits in favor of the Schalis, for purposes of their subsequent malicious prosecution claim. We apply the foregoing principles in considering this question. In doing so, we acknowledge that, as a general proposition, the issue of favorable termination is a legal issue for the court to decide. (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149; CACI No. 1501 [court decides favorable termination as a matter of law, but jury may be required to find preliminary facts before court's legal determination]; see also *Hudis, supra,* 125 Cal.App.4th at pp. 1590-1592 [court ruled on demurrer that termination for lack of standing is not favorable termination].)

The issue of favorable termination presents a factual question *only when there is a conflict regarding the circumstances of termination*, at which point determination of the reasons underlying the dismissal is a question of fact. (*Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1399; *Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 1808; 1 Mallen and Smith, Legal Malpractice (West/Thomson Reuters 2012) § 6:15, pp. 639-640, fn. omitted ["The twofold prerequisite of a termination is finality and conclusion that was favorable to the former defendant. The determination of these issues presents an issue of law for the court, though resolution of predicate factual disputes is for the trier of fact."].)

Here, the recorded grant deed for the Almond Avenue property stated: "For valuable consideration, receipt of which is hereby acknowledged, Grantor(s) Pat D. Maisetti … hereby grant(s) to Fritz Schali and Donna Schali … any and all interest in and to that certain real property in the City of Patterson, County of Stanislaus, State of

California … Commonly known as [XX] Almond Avenue, Patterson, California[,] *reserving therefrom and subject to a Life Estate in Grantor, Pat D. Maisetti*." (Some capitalization omitted, italics added.)

The reformation cause of action in the original complaint and as restated in the FAC pertained to the recorded grant deed and was narrow in scope. The original complaint and FAC essentially alleged that the grant deed for the Almond Avenue property, as recorded in 2020, was erroneous by mistake. The basic allegation was that in 2020, the parties had agreed that Maisetti would transfer the 19-acre property to the Schalis while reserving a life estate in an area approximately 100 feet by 100 feet with access to Almond Avenue. However, the grant deed memorializing the transaction indicated that Maisetti has a life estate over the entire property. The original complaint and FAC sought reformation of the grant deed to reflect the true intent of the parties as to the scope of Maisetti's life estate and also to specify its precise location, while granting the Schalis the remaining area in fee simple.

There is no dispute between the parties that the recorded grant deed was erroneous. The Schalis repeatedly stated in their papers filed in the trial court, and reiterate in their brief to this court, that they did *not* dispute the need to rectify the grant deed to properly identify the scope and location of Maisetti's life estate and undertook negotiations with Beougher and Maisetti to that end. Indeed, the Schalis made efforts to prepare a corrective grant deed that properly described the scope of Maisetti's life estate and provided a legal description of the life estate area as well as drawings thereof. In other words, the Schalis gathered and provided material information that was missing from the recorded, original grant deed. The Schalis' corrective actions continued even after Maisetti's prior, underlying complaint was filed.

Under these circumstances, where Maisetti's reformation cause of action sought the very information and corrections the Schalis ultimately provided, the dismissal of Maisetti's reformation cause of action and of the FAC as a whole, does not represent a

37.

termination on the merits *in favor of* the Schalis. Since there was no dispute over the actual merits of the reformation cause of action—*both parties agreed that the recorded grant deed did not capture their true intent*—Maisetti's voluntary dismissal of her reformation action does not represent an unequivocal vindication of the Schalis at the expense of Maisetti and Beougher, such that the Schalis can properly pursue a malicious prosecution claim against Beougher.

Nor does Maisetti's dismissal of her reformation cause of action indicate that she was of the view that her claim lacked merit. The reformation causes of action encompassed in Maisetti's original complaint and FAC, respectively, were identical. When the Schalis sent a letter threatening sanctions should Maisetti not withdraw her original complaint, Maisetti filed the FAC and restated her reformation cause of action verbatim. Thus, Maisetti restated the *identical* reformation cause of action in the face of threatened sanctions. Accordingly, the fact that Maisetti *subsequently* dismissed her FAC entirely even as the Schalis repeated their sanctions threat, does not reflect on her view of the *merits* of her reformation claim.

The critical wrinkle in this case is that *it is undisputed that both parties agreed* that the recorded grant deed, to the extent it reflected that Maisetti's life estate covered the entire property, did not capture the true intent of the parties. In other words, the substantive merit of the reformation cause of action is not in dispute and, in turn, the ultimate dismissal of that cause of action is not a reflection of the merits thereof.

On this record, we conclude as a matter of law based on undisputed facts, that Maisetti's dismissal of her reformation cause of action and her FAC was not *a termination on the merits in favor of the Schalis*, for purposes of their malicious prosecution claim. Since the Schalis have failed to demonstrate that they obtained a favorable termination on the merits, they have not established a prima facie malicious prosecution claim and have not demonstrated a probability that they will prevail on their malicious prosecution claim.

**E.      Beougher Had Probable Cause to Bring the Reformation Cause of Action**

" 'Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. "[T]he standard of probable cause to bring a civil suit [is] equivalent to that for determining the frivolousness of an appeal [citation], i.e., probable cause exists if 'any reasonable attorney would have thought the claim tenable.' [Citation.] This rather lenient standard for bringing a civil action reflects 'the important public policy of avoiding the chilling of novel or debatable legal claims.' [Citation.] Attorneys and litigants ... ' "have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win...." ' [Citations.] Only those actions that ' "any reasonable attorney would agree [are] totally and completely without merit" ' may form the basis for a malicious prosecution suit." ' " (*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1449, quoting *Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047-1048.)

"[T]he existence or absence of probable cause has traditionally been viewed as a question of law to be determined by the court, rather than a question of fact for the jury." (*Sheldon*, *supra*, 47 Cal.3d at p. 875.) "The question whether, on a given set of facts, there was probable cause to institute an action requires a sensitive evaluation of legal principles and precedents" and is "a task generally beyond the ken of lay jurors[.]" (*Ibid*.)

Here, as noted above, there was no dispute that the recorded grant deed did not capture the full, true intent of the parties and that reformation was in order. Furthermore, Civil Code section 3399 provides: "When through fraud or a mutual mistake of the parties, or a mistake of one party, which the other knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." To state a cause of action under Civil Code section 3399 for reformation of a deed, which through fraud, mutual mistake or mistake of one party known to or suspected by the other, does

not truly express their intention, it is not necessary that the word "mistake" appear in the complaint, it being sufficient if the facts alleged, or the fair inference from them, show fraud or mistake. (*Robertson v. Melville* (1923) 60 Cal.App. 354, 358 ["it is sufficient if the facts alleged, or the inference to be drawn from them, by fair intendment show fraud or mistake"].)

As is the case with summary judgment motions, the issues in an anti-SLAPP motion are framed by the pleadings. (*Wollersheim*, *supra*, 42 Cal.App.4th at p. 655.) The reformation cause of action stated in the original complaint and in the FAC was narrowly tailored to seek reformation of the recorded grant deed to reflect the intent of the parties as to the scope and location of Maisetti's life estate. Under the facts of this case, there was probable cause to file an action for reformation of the recorded grant deed. (See *Jones v. First American Title Insurance Co*. (2003) 107 Cal.App.4th 381, 388 [it is " 'well settled that the remedy of reformation is equitable in nature and not restricted to the exact situations stated in Civil Code section 3399' "]; accord *Merkle v. Merkle* (1927) 85 Cal.App. 87, 105 [permitting party to seek reformation of grant deed where alleged 'mistake' in the deed did not fall within statutory definitions but deed nonetheless did not reflect the parties' intent]; *Philips Medical Capital, LLC v. Medical Insights Diagnostics Center, Inc*. (2007) 471 F.Supp.2d 1035, 1047 [" 'Basic to a cause of action for reformation is a showing of a definite intention or agreement on which the minds of the parties had met which pre-existed and conflicted with the instrument in question.'"], quoting *Appalachian Ins. Co. v. McDonnell Corp*. (1989) 214 Cal.App.3d 1, 21.)

Indeed, the parties were in settlement discussions *after* the FAC was filed on February 1, 2023, with Beougher focusing on recording a corrected grant deed and addressing reimbursement of out-of-pocket costs and/or attorney fees. On February 3, 2023, McHugh and Beougher had a "conversation" in which they discussed settlement of the matter. On February 6, 2023, Beougher sent a letter to McHugh in which he indicated Maisetti would accept a settlement entailing acceptance by Maisetti of a

corrected grant deed prepared by the Schalis, reimbursement of Maisetti's out of pocket costs of $5,055, and dismissal of Maisetti's FAC. As late as February 10, 2023, in response to a query by Beougher, McHugh sent Beougher a *newly* revised grant deed, with a *legal description* of the life estate area prepared on January 16, 2023 (shortly after Maisetti's original complaint was filed).

On February 13, 2023, McHugh responded with her own settlement offer that would entail Maisetti paying the Schalis $40,000 in attorney fees and $795 in reimbursements for plumbing costs on the property, signing off on the *newly* revised grant deed, and dismissing her FAC. Given the discrepancy between the recorded grant deed and the parties' intentions as to the property transaction, the evolving and volatile nature of the negotiations between the parties, and the issues of out-of-pocket costs and/or attorney fees under the life estate agreement, Beougher had probable cause to file the reformation cause of action. We are not persuaded by the Schalis' arguments to the contrary.[11]

In sum, the Schalis have not carried their burden to show that Beougher lacked probable cause to seek reformation of the grant deed *in court*. Maisetti was not required to seek reformation or a corrective grant deed exclusively by directly negotiating with the Schalis. The Schalis have not shown a probability of prevailing on their malicious prosecution claim.

---

[11] Beougher cites *Green Tree Headlands LLC v. Crawford* (2023) 97 Cal.App.5th 1242 in support of his position. There, the Court of Appeal reversed the denial of an anti-SLAPP motion in the malicious prosecution context, holding that the underlying lawsuit was brought with probable cause as it reasonably sought to resolve a complex real estate dispute regarding the interpretation of ambiguous documents. Although the parties in this case both agreed that the deed was incorrect and needed to be reformed, they clearly disagreed as to how to reform it. In fact, the record fails to show whether it was ever reformed by negotiation or otherwise. However, we note that at oral argument, counsel for the Schalis stated that the deed was eventually reformed.

## F. No Prima Facie Showing That Beougher Acted with Malice

"The 'malice' element … relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action.  [Citation.]  The motive of the defendant must have been something other than that of … the satisfaction in a civil action of some personal or financial purpose.  [Citation.]  The plaintiff must plead and prove actual ill will or some *improper* ulterior motive." (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 479 (*Downey Venture*).)  Improper purposes can be established in cases in which, for instance:  (1) the person bringing the suit does not believe that the claim may be held valid; (2) the proceeding is initiated primarily because of hostility or ill will; (3) the proceeding is initiated solely for the purpose of depriving the opponent of a beneficial use of property; or (4) the proceeding is initiated for the purpose of forcing a settlement bearing no relation to the merits of the claim.  (*Sycamore Ridge*, *supra*, 157 Cal.App.4th at p. 1407.)  If the prior action was not objectively tenable, the extent of a defendant's attorney's investigation and research may be relevant to the further question of whether the attorney acted with malice.  (*Ibid.*)

"Since parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence." (*HMS Capital, Inc.*, *supra*, 118 Cal.App.4th at p. 218.)  Here, Beougher filed the complaint and FAC in the prior action seeking to reform the grant deed to reflect the intention of the parties.  *After he filed the FAC*, he and McHugh conducted settlement negotiations.  During these settlement negotiations, Beougher merely sought reformation of the grant deed and reimbursement for Maisetti's related out of pocket expenses.  Beougher did not make other demands; the Schalis made demands such as payment of a plumbing bill by Maisetti as part of any settlement.  On this record, the Schalis have not made a prima facie showing of malice on the part of Beougher.

To the extent the Schalis cite Beougher's initial email of June 20, 2022, in which he sought certain additional concessions from the Schalis in connection with reforming

the grant deed, that communication occurred *well before* the complaint and FAC were filed.  Furthermore, Beougher requested the Schalis to consider those demands on behalf of Maisetti.  Even assuming Maisetti harbored malice, a client's malice is not imputed to her attorney.  (*Daniels*, *supra*, 182 Cal.App.4th at 333.)

## DISPOSITION

The trial court's order denying Beougher's anti-SLAPP motion is reversed.  On remand, the court is directed to grant the anti-SLAPP motion.  Costs on appeal are awarded to appellant Beougher.


SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P. J.


PEÑA, J.